UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARIA SOTO, et al.,                    No. 2:06-cv-01612-MCE-DAD

       Plaintiffs,              Consolidated with:
                                       No. 2:06-cv-02077-MCE-DAD
    v.                          No. 2:07-cv-00398-MCE-DAD
                                       No. 2:07-cv-01229-MCE-DAD
TU PHUOC NGUYEN, et al.,                No. 2:07-cv-01231-MCE-DAD
                                       No. 2:07-cv-01255-MCE-DAD
       Defendants.
                                       Related to:
                                       No. 2:07-cv-01630-MCE-DAD
                                       No. 2:07-cv-01934-MCE-DAD

----oo0oo----

Plaintiffs initiated these actions seeking relief for injuries allegedly suffered as a result of a 2005 bus accident. Presently before the Court are Motions for Partial Summary Judgment filed by Defendant Greyhound Lines, Inc. ("Greyhound"), by which Greyhound argues Plaintiffs' negligence claims, to the extent premised on a failure to provide passenger seat belts, are preempted by federal law and violate the Commerce Clause, U.S. Const., art. I, § 8, cl. 3.  For the following reasons, Defendants' Motions are denied.

1

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. See Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992). The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

///

///

2

Celotex Corp. v. Catrett, 477 U.S. at 323 (quoting Rule 56(c)). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).

///

///

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

On July 1, 2005, a rented passenger car driven by Defendant Tu Phuoc Nguyen collided with a Greyhound bus causing the bus to roll onto its side.  Plaintiffs in the following cases were passengers on that bus, and subsequently initiated this litigation against Greyhound, among others, arguing, *inter alia*, that Greyhound negligently failed to provide passenger seat belts on that bus.

///

///

4

**Consolidated Cases**

<u>Soto v. Greyhound</u>, 2:06-cv-01612
<u>Aitkens v. Greyhound</u>, 2:06-cv-02077
<u>Kuester v. Greyhound</u>, 2:07-cv-00398
<u>Awok v. Greyhound</u>, 2:07-cv-01231
<u>Herrera v. Greyhound</u>, 2:07-cv-01229
<u>Kinard v. Greyhound</u>, 2:07-cv-01255

**Related Cases**[1]

<u>Martin v. Greyhound</u>, 2:07-cv-01934
<u>Teague v. Greyhound</u>, 2:07-cv-01630

Greyhound now brings the instant Motion arguing that Plaintiffs' state law negligence action is impliedly preempted by federal law, specifically the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. § 30101, <u>et seq.</u>, and the Federal Motor Vehicle Safety Standards ("Safety Standards" or "FMVSS"), 49 C.F.R. § 571.208, and that any such state requirement imposes an improper burden on interstate commerce. For the following reasons, Greyhound's arguments fail.[2]

///
///
///
///
///
///

---

[1] The Court is cognizant that neither Plaintiffs Martin nor Teague opposed Greyhound's instant Motion. However, while those cases are related to the others, they have not been consolidated into the primary action. As such, even were the Court inclined to grant Greyhound's instant Motion, it could not do so as to these Plaintiffs because Greyhound never filed its Motion on the proper dockets for those cases.

[2] Greyhound objected to much of Plaintiffs' submitted evidence. However, because the Court did not rely on the challenged evidence in reaching its decision, Greyhound's objections are overruled as moot.

1        **1.    Preemption of State Law**

2

3        "Pre-emption may be either expressed or implied, and 'is

4    compelled whether Congress' command is explicitly stated in the

5    statute's language or implicitly contained in its structure and

6    purpose.'"  Gade v. National Solid Wastes Management Ass'n, 505

7    U.S. 88, 98 (1992), quoting Jones v. Rath Packing Co., 430 U.S.

8    519, 525 (1977).  "Absent explicit pre-emptive language, [the

9    United States Supreme Court] ha[s] recognized at least two types

10   of implied pre-emption: field pre-emption, where the scheme of

11   federal regulation is so pervasive as to make reasonable the

12   inference that Congress left no room for the States to supplement

13   it and conflict pre-emption, where compliance with both federal

14   and state regulations is a physical impossibility or where state

15   law stands as an obstacle to the accomplishment and execution of

16   the full purposes and objectives of Congress."  Id. (internal

17   citations and quotations omitted).  "[The Court's] ultimate task

18   in any pre-emption case is to determine whether state regulation

19   is consistent with the structure and purpose of the statute as a

20   whole."  Id.

21       In the instant case, "[t]he purpose of [the Safety Act] is

22   to reduce traffic accidents and deaths and injuries resulting

23   from traffic accidents."  49 U.S.C. § 30101.  According to the

24   Act, "[t]he Secretary of Transportation shall prescribe motor

25   vehicle safety standards.  Each standard shall be practicable,

26   meet the need for motor safety, and be stated in objective

27   terms."  Id., § 30111.

28   ///

Pursuant to 49 C.F.R. § 1.50, the Secretary of Transportation has delegated to the National Highway Traffic Safety Administration ("NHTSA") the authority to carry out the relevant provisions of the Act.

The Safety Act expressly limits the power of the states to implement standards that differ from those federally imposed. Pursuant to 49 U.S.C. § 30103(b), "(1) When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter. (2) A State may enforce a standard that is identical to a standard prescribed under this chapter."  Nevertheless, the statute also contains a savings clause, which states, "Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." Id., § 30103(e).

Accordingly, Greyhound does not argue that federal law expressly preempts Plaintiffs' negligence claim.  Indeed, that very argument was foreclosed in Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 868 (2000) (determining that the presence of a savings clause within the Safety Act precluded a finding that the Act's express pre-emption provision applied to state tort law).  Instead, Greyhound argues here that California's tort law is impliedly preempted by the Safety Act and applicable Safety Standards.

///

1  Accordingly, the crux of the instant dispute, like the issue
2  before the Geier Court, is whether a common-law "no seat belt"
3  action like the one before this Court actually conflicts with
4  federal law.

5       In Geier, the plaintiffs claimed that the defendant auto
6  manufacturer had negligently designed and manufactured its
7  vehicles because, *inter alia*, those vehicles lacked driver's side
8  air bags.  Id. at 865.  The applicable safety standard in that
9  case did not mandate the use of air bags and instead provided
10 manufacturers with a choice among several passive restraint
11 alternatives.  Id.

12      The United States Supreme Court observed that "[t]he
13 Department of Transportation's (DOT's) comments, which
14 accompanied the promulgation of [the applicable safety standard]
15 [made] clear that the standard deliberately provided the
16 manufacturer with a range of choices among different passive
17 restraint devices."  Id. at 874-875.  The Court went on to point
18 out that the standard ultimately put into place "deliberately
19 sought variety - a mix of several different passive restraint
20 systems.  It did so by setting a performance requirement for
21 passive restraint devices and allowing manufacturers to choose
22 among different passive restraint mechanisms, such as airbags,
23 automatic belts, or other passive restraint technologies to
24 satisfy that requirement."  Id. at 878.
25 ///
26 ///
27 ///
28 ///

Furthermore, "DOT wrote that it had *rejected* a proposed FMVSS 208 'all airbag' standard because of safety concerns (perceived or real) associated with airbags, which concerns threatened a 'backlash' more easily overcome 'if airbags' were 'not the only way of complying.'" Id. at 879 (emphasis in original).

Nevertheless, the plaintiffs in that case alleged "that manufacturers had a duty to install an airbag when they manufactured [the vehicle]." Id. at 881. The Supreme Court disagreed stating, "[s]uch a state law-*i.e.*, a rule of state tort law imposing such a duty-by its terms would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors. It thereby would have presented an obstacle to the variety and mix of devices that the federal regulation sought. It would have required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-related portion of their...new car fleet, even though [the safety standard] at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all. It thereby also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed." Id. Thus, the Court determined that "[b]ecause the rule of law for which [plaintiffs] contend would have stood 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives...it [was] pre-empted." Id.

///

///

Here as in <u>Geier</u>, federal law does not require passenger seat belts to be installed in buses.  Rather, 49 C.F.R. § 571.208 S4.4.2 requires the following:

> Buses manufactured on or after September 1, 1990.  Each bus manufactured on or after September 1, 1990, shall meet the requirements of S4.4.2.1 or S4.4.2.2.

> S4.4.2.1 First option--complete passenger protection system--driver only.  The vehicle shall meet the crash protection requirements of S5, with respect to an anthropomorphic test dummy in the driver's designated seating position, by means that require no action by vehicle occupants.

> S4.4.2.2 Second option--belt system--driver only.  The vehicle shall, at the driver's designated seating position, have either a Type 1 or a Type 2 seat belt assembly that conforms to § 571.209 of this part ans S7.2 of this Standard.

These standards were adopted after passenger seat belt requirements were proposed and subsequently withdrawn by the NHTSA.  The NHTSA explained its decision to forego passenger protection requirements, stating:

> An earlier proposal on bus passenger seating would have applied to all buses, including intercity and transit buses (38 FR 4776, February 22, 1973).  Comments on that proposal emphasized that the different vehicle structures, operating speeds and conditions, and accident modes of school buses in relation to transit and intercity buses necessitate separate requirements for buses which carry children to and from school.

> The NHTSA has in fact determined that seating requirements for intercity and transit buses are not justified, based on benefit/cost studies of present seating performance in these buses.  Injury statistics for intercity buses indicate that seating improvement would not reduce injuries substantially.  Seat belt usage surveys in intercity buses also indicate that a very low percentage of passengers would utilize seat belts if they were provided.

///

///

In relatively slow-speed transit bus operation, seat strength and seat back height are not significant safety problems.  Some injuries can be attributed to the "grab rail" design of transit buses, but removal of these aids would increase the already larger number of injuries to standing passengers which occur when they are thrown to the floor of the bus in an accident.  The NHTSA therefore withdraws its proposed minimum seating standards for intercity and transit buses because of the adequacy of this seating as presently designed. This action denies the petition of the Center for Auto Safety to require the installation of seat belts on intercity buses.  The NHTSA will, of course, propose standards in the future in this area if they are found desirable.

39 F.R. 147 (July 30, 1974).

While deceptively similar, this case is substantially different from Geier in one important aspect.  That is, in Geier, the Department of Transportation determined that airbags should not be mandated.  See 49 F.R. 29000-29001 (July 17, 1984) ("[A]irbags should not be required in all cars.").  In this case, however, the NHTSA simply determined that passenger seat belts need not be required.

Contrary to the Geier gradual phase-in objectives and related goal of providing manufacturers with a certain amount of flexibility when choosing among various passenger restraints, the purpose of the regulation originally submitted in the instant case was "to propose a new motor vehicle safety standard to require buses to have passenger seats that [were] stronger, higher, and less hostile on impact than present seats.  The goal [was] to reduce injuries to bus passengers by providing seats that protect[ed] passengers rather than contribut[ed] to their injuries."  38 F.R. 35 (Feb. 22, 1973).

///

///

11

1    Unlike the <u>Geier</u> case, in which the proposed safety standards
2  were rejected for a myriad of reasons, in this case, the NHTSA
3  ultimately withdrew its seat belt proposal simply because it
4  determined that the more exhaustive guidelines regarding seat back
5  height and seat strength were not necessary on intercity and
6  transit buses. 39 F.R. 147. The NHTSA referenced seat belts only
7  in passing, stating that "a very low percentage of passengers
8  would utilize seat belts if they were provided." <u>Id</u>. Thus, while
9  the state air-bag requirement in <u>Geier</u> would actually have impeded
10 the gradual phase-in of devices as well as the option to choose
11 between alternative passive restraint systems, in this case there
12 is no indication that a state requirement regarding the presence
13 of seat belts would contribute to passenger injuries or otherwise
14 impede the purpose of the instant regulation.

15   Accordingly, as stated, the critical difference between this
16 case and <u>Geier</u> is that the federal intent here indicates no seat
17 belt mandate need be enacted, while in <u>Geier</u>, the relevant intent
18 indicated that those mandates should not be enacted.  This
19 distinction is more than semantic as, based on a review of the
20 applicable case law, an agency decision that a proposed
21 requirement <u>should</u> not be implemented may result in the
22 preemption of state law, while a determination that a requirement
23 <u>need</u> not be enacted, at least in this case, will not.[3]
24 ///

25

26    [3] While the Court concludes that an agency determination
   that a federal standard should not be implemented is necessary to
27 support a preemption finding under the circumstances present in
   this case, the Court does not today hold that such a
28 determination is necessarily, in every case, sufficient to
   independently support preemption.

1    Despite Greyhound's assertions to the contrary, its cited

2    authority further supports the Court's conclusion.  For example,

3    in Gracia v. Volvo Europa Truck, N.V., a plaintiff was injured

4    when she was ejected through a truck windshield that had been

5    designed to dislodge during an accident.  112 F.3d 291, 293 (7th

6    Cir. 1997).  The relevant safety standard in that case

7    "'establish[ed] windshield retention requirements for motor

8    vehicles during crashes.'"  Id. at 295, quoting 49 C.F.R.

9    § 571.212.S1.  That standard, however, did not apply to forward

10   control vehicles with a gross vehicle weight rate of more than

11   10,000 pounds, such as the vehicle in which the plaintiff had

12   been riding.  Id., citing 49 C.F.R. § 571.212.S3.  That court

13   determined that "the existence of the exclusionary language in

14   the federal safety standard mandate[ed] that [the court]

15   interpret it as representing a conscious decision by the NHTSA.

16   An examination of the legislative history further bolster[ed]

17   that it was the intent of the NHTSA to exclude trucks such as the

18   one at issue...from having to meet any windshield retention

19   requirements."  Id. at 297.

20   However, while the affirmative decision to forgo application

21   of the standard to the vehicle in that case may sound similar to

22   the withdrawal of proposal here, the two situations are in

23   actuality quite different.  The Gracia court specifically pointed

24   out that:

25   ///

26   ///

27   ///

28   ///

13

In 1969 the NHTSA's predecessor, the Federal Highway Administration, proposed to extend standard 212 to cover vehicles such as the truck at issue.  34 Fed. Reg. 14438 (1969) (proposed September 10, 1969); R. 216, Ex. 5.  The response submitted in opposition to this amendment by the Automobile Manufacturers Association ("AMA") explained that the configuration of forward control vehicles renders any level of windshield retention basically meaningless because the impact either directly involves the windshield or results in severe deformation of the windshield mounting structure.  R. 216, Ex. 6, AMA's Comments on Proposed Amendment, at S70-3.4 and S70-3.5 The AMA further explained that the windshield has been identified as an important means of escape from a truck, particularly when it comes to rest on its side after an accident.  Id.  After receiving responses such as these, the NHTSA decided that forward control vehicles, such as the truck at issue, would not be required to comply with the standard until September 1, 1978.  37 Fed. Reg. 16980 (1972) (recognizing that forward control vehicles would have difficulty in retaining windshields because of reasons given by the AMA).  The NHTSA finally determined in 1977 that given the design of forward control vehicles it was both technically impracticable to design windshields which could comply with the standards and impracticable to apply the standard's barrier crash tests to these vehicles.  42 Fed. Reg. 34289 (1977); 41 Fed. Reg. 36193 (1976).

Gracia, 112 F.3d at 297.  Contrary to the instant dispute, that court looked, not to a federal determination that the proposed regulations were unnecessary, but to a more affirmative decision that, for a variety of reasons, the regulations should not apply to the vehicle in that case.  See Id. (citing with approval the district court's statement that "there has been 'an affirmative decision by agency officials' that there should be no standard because the nature of the cab design on forward control vehicles makes compliance with the minimum standard set by FMVSS impracticable").  As such, citation to Gracia is inapposite.

///

///

14

Next, in Fisher v. Ford Motor Co., a driver sitting in close proximity to a driver's side air bag was injured when the device deployed during a low-speed collision.  224 F.3d 570, 571 (6th Cir. 2000).  A label containing federally mandated language warning of some of the dangers posed by the airbag had been placed on the driver's sun visor.  Id.  The only issue on appeal was "whether additional labels, placed elsewhere in the vehicle than on the sun visor, could contain language different than that mandated by FMVSS 208."  Id. at 574.  "However, as the district court reasoned, echoing the published regulation, NHTSA policy indicated that NHTSA thought of its warning language as not simply the minimum, but as the sole language it wanted on the subject.  NHTSA feared 'information overload,' i.e., that additional warnings would distract from the warnings it had determined were critical, leading consumers not to focus properly on the latter.  It was also concerned that additional warnings might simply lead people to pay no attention to any of them."  Id.  Accordingly, the appellate court determined that "additional and *different* warning labels" were preempted."  Id. (emphasis in original).

Again, however, this case differs in that the absence of federal seat belt requirements for passengers is more descriptive of a minimum protection mandated by federal law, rather than a clear indication that such passive restraints should not be required.

///

///

///

15

Unlike the facts before the <u>Fisher</u> court, in which the federal agency had determined the mandated language alone would properly convey the requisite warning and that any additional language would both create confusion and undermine the purpose of the visor warning, in this case, the agency simply determined that a passive restraint requirement for passengers was not called for. Once more, the critical difference is whether the agency decision was couched in terms of "need" or "should."

Finally, in <u>Hurley v. Motor Coach Industries, Inc.</u>, the driver of a Greyhound bus filed suit after suffering collision-related injuries.  222 F.3d 377, 378 (2000).  According to the driver, the bus manufacturer was liable for his injuries because it failed to install any driver protection other than a two point seat belt.  <u>Id</u>.

However, the defendant argued, *inter alia*, "that because [the plaintiff's alternative proposed] design foreclose[d] a manufacturer's choice between seat belts and airbags, it [was] preempted."  <u>Id</u>. at 381.  The <u>Hurley</u> court pointed out the close similarities between that case and <u>Geier</u>, which "confirm[ed] [the defendant's] theory that a state lawsuit that forecloses an option left open by [the applicable safety standard] is in fact preempted."  <u>Id</u>. at 382.  "[A]s in <u>Geier</u>, the decision to leave options open to bus manufacturers was made with specific policy objectives in mind."  <u>Id</u>.

///
///
///
///

16

1        No such objectives support the instant lack of federal

2   regulations.  The decision to forego imposition of a seat belt

3   requirement for bus passengers in this case was not premised on

4   any articulated policy driven by a choice between alternative

5   restraint options.  Thus, the only way in which the Hurley logic

6   would be even remotely implicated under the instant facts would

7   be if the withdrawal of the proposed regulations was viewed as an

8   affirmative agency decision to afford manufacturers the choice

9   between installing seat belts or installing nothing.  However,

10  such an interpretation of the lack of seat belt requirements

11  would effectively eliminate the savings clause in the federal

12  statutory scheme.  Indeed, if the Court determined that the

13  proposal and withdrawal of a safety standard constituted a

14  conscious decision to leave open the option to choose between the

15  "alternatives" of complying or not complying with that proposed

16  standard, then any time an agency considered and rejected a new

17  mandate, state law would be preempted despite the express

18  statement of federal intent embodied in the statutory language

19  preserving state common-law claims.  Accordingly, for all of the

20  above reasons, Greyhound's arguments are rejected.

21       Plaintiff's proffered authority is more on point.  First, in

22  Freightliner Corp. v. Myrick, the plaintiffs sued the

23  manufacturers of tractor-trailers alleging that the defendants

24  negligently failed to install antilock braking systems ("ABS") in

25  their vehicles.  514 U.S. 280 (1995).  At that time, there were

26  no existing Safety Standards mandating the use of ABS in the

27  relevant trucks.  Id. at 285-286.

28  ///

1    Accordingly, the defendants argued, *inter alia*, that the

2    plaintiffs' state law claims were impliedly preempted by federal

3    law.  Id. at 289.

4         The United States Supreme Court disagreed.  First, the Court

5    determined, "it is not impossible for petitioners to comply with

6    both federal and state law because there is simply no federal

7    standard for a private party to comply with.  Nothing in the

8    Safety Act or its regulations currently regulates the use of ABS

9    devices.  As [the safety standard] imposes no requirements either

10   requiring or prohibiting ABS systems, tractor-trailer

11   manufacturers are free to obey state standards concerning

12   stopping distances and vehicle stability."  Id.  The same is true

13   here, and Defendants do not argue otherwise.

14        More pertinent, however, is the Supreme Court's statement

15   that "we cannot say that the [plaintiffs'] lawsuits frustrate

16   'the accomplishment and execution of the full purposes and

17   objectives of Congress.'  In the absence of a promulgated safety

18   standard, the Act simply fails to address the need for ABS

19   devices at all.  Further, Standard 121 currently has nothing to

20   say concerning ABS devices one way or the other, and NHTSA has

21   not ordered truck manufacturers to refrain from using ABS

22   devices.  A finding of liability against [the defendants] would

23   undermine no federal objectives or purposes with respect to ABS

24   devices, since none exist."  Id. at 289-290, quoting Hines v.

25   Davidowitz, 312 U.S. 52, 67 (1941).

26   ///

27   ///

28   ///

1    Similarly, in this case, there is no federal standard

2 addressing the need for bus passenger seat belts one way or

3 another.  Furthermore, the NHTSA has given no indication that the

4 installation of seat belts, or a state requirement regulating

5 such passive restraints, would act as an obstacle to an

6 overriding federal policy.  Thus, the state law in this case

7 simply does not undermine a nonexistent federal purpose or

8 objective.

9    The Supreme Court decision in Sprietsma v. Mercury Marine,

10 537 U.S. 51 (2002), also supports the Court's instant decision.

11 In Sprietsma, the issue was "whether a state common-law tort

12 action seeking damages from the manufacturer of an outboard motor

13 [was] pre-empted either by the enactment of the Federal Boat

14 Safety Act of 1971...or by the decision of the Coast Guard...not

15 to promulgate a regulation requiring propeller guards on

16 motorboats."  Id. at 54.

17    In that case, the Secretary of Transportation delegated

18 regulating authority to the Coast Guard.  Id. at 57.  Having

19 determined that further inquiry was needed into propeller-related

20 injuries, the Coast Guard authorized the appointment of a

21 subcommittee formed to study the causes and possible methods of

22 injury prevention.  Id. at 60-61.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

That subcommittee advised the Coast Guard to refrain from regulating propeller guards, basing its recommendation upon findings that "given current technology, feasible propeller guards might prevent penetrating injuries but increase the potential for blunt trauma caused by collision with the guard, which enlarges the boat's underwater profile; feasible models would cause power and speed loss at higher speeds; and it would be prohibitive[ly] expensive to retrofit all existing boats with propeller guards because '[n]o simple universal design suitable for all boats and motors in existence' has been proved feasible." Id. at 61 (internal citations and quotations omitted). "[T]he Chief of the Coast Guard's Office of Navigation Safety and Waterway Services agreed that the available accident data did not support the adoption of a regulation requiring propeller guards on motorboats, but stated that the Coast Guard would continue to review information regarding development and testing of new propeller guarding devices or other information on the state of the art." Id. (internal citations and quotations omitted).

Nevertheless, when analyzing the defendant's implied preemption argument, the court rejected "reliance on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats" as a basis for preemption. Id. at 65. The Supreme Court elaborated:

///

///

///

///

///

20

It is quite wrong to view that decision as the
functional equivalent of a regulation prohibiting all
States and their political subdivisions from adopting
such a regulation.  The decision in 1990 to accept the
subcommittee's recommendation to take no regulatory
action left the law applicable to propeller guards
exactly the same as it had been before the subcommittee
began its investigation.  Of course, if a state common-
law claim directly conflicted with a federal regulation
promulgated under the Act, or if it were impossible to
comply with any such regulation without incurring
liability under state common law, pre-emption would
occur.  This, however is not such a case.

Id.  The Court went on to point out that Coast Guard statements

"reveal[ed] only a judgement that the available data did not meet

the [agency's] 'stringent' criteria for federal regulation.  The

Coast Guard did not take the further step of deciding that, as a

matter of policy, the States and their political subdivisions

should not impose some version of propeller guard regulation, and

it most definitely did not reject propeller guards as unsafe."

Id. at 66-67.  The Court concluded, "although the Coast Guard's

decision not to require propeller guards was undoubtedly

intentional and carefully considered, it does not convey an

'authoritative' message of a federal policy against propeller

guards."  Id. at 67.

Based on the above analysis, the Supreme Court implicitly

acknowledged that: 1) the existing regulatory scheme simply

reflected a Coast Guard determination that propeller guard

mandates were unnecessary; and 2) the decision to forego

propeller guard regulations did not reflect a determination that

state common law should not govern the installation of such

devices.  Thus, the facts of the instant case are strikingly

similar to those in Sprietsma.

///

21

Here, as there, and for the same reasons articulated by that Court, the lack of regulation simply cannot be viewed as the functional equivalent of a prohibition on state common law claims such as Plaintiffs'. Accordingly, this Court now finds that Plaintiffs' state claims are not preempted by federal law and Defendants' Motions for Partial Summary Judgment are denied.

### 2.   The Commerce Clause

"Article I, § 8, cl. 3, of the Constitution expressly authorizes Congress to 'regulate Commerce with foreign Nations, and among the several States.' It says nothing about the protection of interstate commerce in the absence of any action by Congress. Nevertheless,...the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. The Clause... 'by its own force' prohibits certain state actions that interfere with interstate commerce.'" Quill Corp. v. North Dakota By and Through Heitkamp, 504 U.S. 298, 309 (1992).

Thus, "[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause, even if it interferes with interstate commerce." White v. Mass. Council fo Construction Employers, Inc., 460 U.S. 204, 213 (1983). However, "'[a]bsent...congressional approval, a state law may violate the unwritten rules described as the 'dormant Commerce Clause' either by imposing an undue burden on both out-of-state and local producers engaged in interstate activities or by treating out-of-state producers less favorably than their local competitors.'"

1   <u>Haynes v. National R.R. Passenger Corp.</u>, 423 F. Supp. 2d 1073,

2   1083 (C.D. Cal. 2006), quoting <u>Granholm v. Heald</u>, 544 U.S. 460,

3   (2005).

4        Thus, "[a]lthough the commerce clause conferred on the

5   national government power to regulate commerce, its possession of

6   the power does not exclude all state power of regulation.'" <u>Id.</u>,

7   quoting <u>Southern Pac. Co. v. Arizona</u>, 325 U.S. 761, 766 (1945).

8   "In the absence of conflicting legislation by Congress, states

9   have the power to make laws governing matters of local concern

10  which nevertheless in some measure affect interstate commerce or

11  even, to some extent, regulate it." <u>Id.</u>, citing <u>Simpson v.</u>

12  <u>Shepard</u>, 230 U.S. 352, 399-400 (1913).

13       "Where the statute regulates evenhandedly to effectuate a

14  legitimate local public interest, and its effects on interstate

15  commerce are only incidental, it will be upheld unless the burden

16  imposed on such commerce is clearly excessive in relation to the

17  putative local benefits." <u>Pike v. Bruce Church, Inc.</u>, 397 U.S.

18  137, 142 (1970).  A challenge to a state law depends, in part, on

19  a showing that the law 'impedes substantially the free flow of

20  commerce from state to state.'" <u>Burlington Northern Railroad Co.</u>

21  <u>v. Dept. of Public Service</u>, 763 F.2d 1106, 1114 (9th Cir. 1985),

22  quoting <u>Southern Pac. Co.</u>, 325 U.S. at 767.

23       As a threshold matter, in this case, the presence of the

24  savings clause in the applicable statutory regime itself

25  indicates an express delegation of power to the states.  The

26  instant negligence claim, to the same extent not impliedly

27  preempted by federal law, falls within that delegation of power.

28  ///

1    Accordingly, the Commerce Clause does not apply in this instance,
2    and no further analysis should be required.  See White, 460 U.S.
3    at 213; see also Gerling Global Reinsurance Corp. of America v.
4    Low, 240 F.3d 739, 746 (9th Cir. 2001) (determining the dormant
5    Commerce Clause inapplicable because Congress had expressly
6    delegated the power to regulate insurance to the states).

7         Nevertheless, even if that were not the case, Defendant has
8    failed to make any factual showing in support of its instant
9    Motion.  Defendant submitted absolutely no evidence indicating:
10   1) that the effects on interstate commerce are more than
11   incidental, or 2) any burden Plaintiffs' negligence claim will
12   have on interstate commerce.  To the contrary, Defendant makes
13   only unsubstantiated claims such as, "Clearly, any requirement
14   that Greyhound must equip its buses with seat belts is not
15   incidental and would be very costly to implement, especially when
16   other states do not impose such a requirement.  Therefore, this
17   penalizes interstate commerce without sufficient economic
18   justification and as such is unconstitutional."  Reply, 8:2-5.
19   Defendant's conclusory reliance on the Commerce Clause is wholly
20   insufficient to meet its burden on summary judgment.
21   Accordingly, Defendant's Motion is denied.
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

1

**CONCLUSION**

2

3      For the reasons just stated, Greyhound's Motions for Partial

4  Summary Judgment (Docket Nos. 76-83) are DENIED.[4]

5      IT IS SO ORDERED.

6

Dated: June 29, 2009

7

8                                    _____

9                                    MORRISON C. ENGLAND, JR.
                                     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

_____

27      [4] Because oral argument will not be of material assistance,
   the Court ordered this matter submitted on the briefing.  E.D.
28  Cal. Local Rule 78-230(h).

25